**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 15 – 223 – CG |
| | ) | |
| CHRISTOPHER MANFUSO | ) | |

## PLEA AGREEMENT

The defendant, **CHRISTOPHER MANFUSO**, represented by his counsel, and the United States of America have reached a plea agreement in this case, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the terms and conditions of which are as follows:

### RIGHTS OF THE DEFENDANT

1.  The defendant understands his rights as follows:

    a.  To be represented by an attorney;

    b.  To plead not guilty;

    c.  To have a trial by an impartial jury;

    d.  To confront and cross-examine witnesses and to call witnesses and produce other evidence in his defense; and

    e.  To not be compelled to incriminate himself.

### WAIVER OF RIGHTS AND PLEA OF GUILTY

2.  The defendant waives rights b through e, listed above, and pleads guilty to Count One of the Information, charging a violation of Title 18, United States Code, Section 371 (conspiracy to violate the Anti-Kickback Statute).

3.  The defendant understands that the statements he makes under oath in the plea of guilty must be completely truthful and that he can be prosecuted for making false

Rev. 8/14

statements or perjury, or receive a perjury enhancement at sentencing, for any false statements he makes intentionally in this plea of guilty.

4. The defendant expects the Court to rely upon his statements here and his response to any questions that he may be asked during the guilty plea hearing.

5. The defendant is not under the influence of alcohol, drugs, or narcotics. He is certain that he is in full possession of his senses and is mentally competent to understand this Plea Agreement and the guilty plea hearing which will follow.

6. The defendant has had the benefit of legal counsel in negotiating this Plea Agreement. He has discussed the facts of the case with his attorney, and his attorney has explained to the defendant the essential legal elements of the criminal charge which has been brought against him. The defendant's attorney has also explained to the defendant his understanding of the United States' evidence and the law as it relates to the facts of his offense.

7. The defendant understands that the United States has the burden of proving each of the legal elements of the criminal charge beyond a reasonable doubt. The defendant and his counsel have discussed possible defenses to the charge. The defendant believes that his attorney has represented him faithfully, skillfully, and diligently, and he is completely satisfied with the legal advice of his attorney.

8. A separate document, entitled Factual Resume, will be submitted to the Court as evidence at the guilty plea hearing. The Factual Resume is incorporated by reference into this Plea Agreement. The defendant and the United States agree that the Factual Resume is true and correct. Alterations to the Plea Agreement or

Factual Resume initialed only by the defendant and his counsel are not part of this agreement and are not agreed to by the United States.

9.  This plea of guilty is freely and voluntarily made and is not the result of force, threats, promises, or representations, apart from those representations set forth in this Plea Agreement.  There have been no promises from anyone as to the particular sentence that the Court will impose.  The defendant is pleading guilty because he is guilty.

10. The defendant also knowingly and voluntarily waives all rights, whether asserted directly or through a representative, to receive from the United States after sentencing any further records, reports, or documents pertaining to the investigation or prosecution of this matter.  This waiver includes, but is not limited to, rights under the Freedom of Information Act and the Privacy Act of 1974.

## PENALTY

11. The maximum penalty the Court could impose as to Count One of the is:

a.  Five years imprisonment;

b.  A fine not to exceed $250,000;

c.  A term of supervised release of 3 years, which would follow any term of imprisonment.  If the defendant violates the conditions of supervised release, he could be imprisoned for the entire term of supervised release;

d.  A mandatory special assessment of $100.00; and

e.  Such restitution as may be ordered by the Court.

## SENTENCING

12.   The Court will impose the sentence in this case. The United States Sentencing Guidelines are advisory and do not bind the Court. The defendant has reviewed the application of the Guidelines with his attorney and understands that no one can predict with certainty what the sentencing range will be in this case until after a pre-sentence investigation has been completed and the Court has ruled on the results of that investigation. The defendant understands that at sentencing, the Court may not necessarily sentence the defendant in accordance with the Guidelines. The defendant understands that he will not be allowed to withdraw his guilty plea if the advisory guideline range is higher than expected, or if the Court departs or varies from the advisory guideline range.

13.   The defendant understands that this Plea Agreement does not create any right to be sentenced in accordance with the Sentencing Guidelines, or below or within any particular guideline range, and fully understands that determination of the sentencing range or guideline level, or the actual sentence imposed, is solely the discretion of the Court.

14.   The United States will provide all relevant sentencing information to the Probation Office for purposes of the pre-sentence investigation. Relevant sentencing information includes, but is not limited to, all facts and circumstances of this case and information concerning the defendant's conduct and background.

15.   Both the defendant and the United States are free to allocute fully at the time of sentencing.

16.     The defendant agrees to tender $100.00 to the U.S. District Court Clerk in satisfaction of the mandatory special assessment in this case. The United States reserves the right to withdraw any favorable recommendations it may agree to within this document if the defendant fails to pay the special assessment prior to or at the time of his sentencing.

## RESTITUTION

17.     Pursuant to 18 U.S.C. §§ 3556 and 3663(A), restitution is mandatory. The defendant agrees to make full restitution in an amount to be determined by the Court at sentencing.

## FINANCIAL OBLIGATIONS

18.     The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court. In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party.

## UNITED STATES' OBLIGATIONS

19.     The United States will not bring any additional charges against the defendant related to the facts underlying the Information and will move to dismiss any remaining charges against the defendant once sentence is imposed in this case. This agreement is limited to the United States Attorney's Office for the Southern

Rev. 8/14

District of Alabama.   However, the United States Attorney's Office for the Central District of California also agrees to be bound by this plea agreement so long as the defendant agrees to fully cooperate with that district as well.   This agreement does not bind any other federal, state, or local prosecuting authorities.

20.     The United States will recommend to the Court that the defendant be sentenced at the low end of the advisory sentencing guideline range as determined by the Court.

**APPLICATION OF USSG § 5K1.1 AND/OR FED. R. CRIM. P. 35**

21.     The defendant understands and agrees that he has no right to cooperate, and that the decision whether to allow him to cooperate is reserved solely to the United States in the exercise of its discretion.   If the United States agrees to allow the defendant to cooperate, and if the defendant agrees to cooperate, the following terms and conditions apply:

 a.  The defendant shall fully, completely, and truthfully respond to all questions put to him by law enforcement authorities regarding the underlying facts of the offense(s) with which he is charged, as well as the underlying facts of any criminal offense(s), state or federal, of which he has information or knowledge.

 b.  The defendant acknowledges that he understands that he shall provide truthful and complete information regarding any offense about which he has knowledge or information regardless of whether law enforcement authorities question him specifically about any such offense.   This

Rev. 8/14

provision requires the defendant to divulge all information available to him even when law enforcement authorities do not know about the defendant's involvement, knowledge or information relating to any particular offense. This requirement extends to any and all persons about whom the defendant has such knowledge or information.

c. The defendant agrees to cooperate completely with all law enforcement authorities in any matters to which his cooperation may be deemed relevant by any law enforcement authority. The defendant agrees to fully comply with all instructions from law enforcement authorities regarding the specific assistance he shall provide. This includes, but is not limited to, consenting to monitored and/or recorded telephone conversations, participating in undercover operations, testifying completely and truthfully before any grand jury, at any pre-trial proceeding, during any trial, and any post-trial proceeding.

d. If the United States deems it necessary, the defendant may be required to take a polygraph examination(s) which will be administered by a government polygrapher. The defendant agrees that the results of any polygraph examination may be used by the United States in its evaluation of whether there has been substantial assistance, and are admissible at sentencing to rebut an assertion by the defendant of bad faith or unconstitutional motive on the part of the United States.

Rev. 8/14

e. The defendant agrees to turn over to the United States any and all documents, tapes and other tangible objects which are in his possession or under his control and which are relevant to his participation in and knowledge of criminal activities, regardless of whether it relates to the charged offense. This obligation is a continuing one and includes materials that the defendant may acquire, obtain or have access to after the execution of this agreement.

f. The defendant also agrees to identify the assets of any other person which were obtained through or facilitated the defendant's illegal activities or the illegal activities of another.

g. If the defendant provides full, complete, truthful and substantial cooperation to the United States, which results in substantial assistance to the United States in the investigation or prosecution of another criminal offense, a decision specifically reserved by the United States in the exercise of its sole discretion, then the United States agrees to move for a downward departure in accordance with Section 5K1.1 of the United States Sentencing Guidelines or Rule 35 of the Federal Rules of Criminal Procedure, whichever the United States deems applicable. The United States specifically reserves the right to make the decision relating to the extent of any such departure request made under this agreement based upon its evaluation of the nature and extent of the defendant's cooperation. The defendant understands that the United States will make no

Rev. 8/14

representation or promise with regard to the exact amount of reduction, if any, the United States might make in the event that it determines that the defendant has provided substantial assistance. The defendant understands that a mere interview with law enforcement authorities does not constitute substantial assistance. The defendant also understands that, should he provide untruthful information to the United States at any time, or fail to disclose material facts to the United States at any time, or commits a new criminal offense, the United States will not make a motion for downward departure. If the defendant's effort to cooperate with the United States does not amount to substantial assistance as determined solely by the United States, the United States agrees to recommend that the defendant receive a sentence at the low end of the advisory guideline range.

h. The United States and the defendant agree that any breach of this agreement by the defendant, including but not limited to committing a new offense, failing to cooperate, intentionally withholding information, giving false information, committing perjury, failing to identify assets obtained by him from his illegal activities or obtained by others associated with him or of which he has knowledge, refusing to take a polygraph examination, failing a polygraph examination, or refusing to testify before the grand jury or at any judicial proceeding, would:

(1) permit the United States to reinstate and proceed with prosecution on any other charges arising from the matters underlying the Information; and

(2) permit the United States to initiate and proceed with the prosecution on any other charges arising from a breach of this agreement. The United States will not be limited, in any respect, in the use it may make against the defendant of any information provided by the defendant during his breached cooperation. Such breach will constitute a waiver of any claim the defendant could make under the United States Constitution, the Federal Rules of Evidence, the Federal Rules of Criminal Procedure, or any statute or case law by which the defendant seeks to suppress the use of such information or any evidence derived from such information.

i. Nothing in this agreement shall protect the defendant in any way from prosecution for any offense committed after the date of this agreement, including perjury, false declaration, false statement, and obstruction of justice, should the defendant commit any of these offenses during his cooperation. The defendant acknowledges and agrees that the information that he discloses to the United States pursuant to this agreement may be used against him in any such prosecution.

Rev. 8/14

j. The United States and the defendant agree that the defendant will continue his cooperation even after he is sentenced in the instant matter. His failure to continue his cooperation will constitute a breach of this agreement, and the defendant agrees that under such conditions, the United States will be free to reinstate the charges and the prosecution of the charges in the Information, which are to be dismissed in accordance with this agreement. Under these circumstances, the defendant expressly waives any rights he may have under the statute of limitations and the speedy trial provisions.

### LIMITED WAIVER OF RIGHT TO APPEAL AND WAIVER OF COLLATERAL ATTACK

22. As part of the bargained-for exchange represented in this plea agreement, and subject to the limited exceptions below, the defendant knowingly and voluntarily waives the right to file any direct appeal or any collateral attack, including a motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255. Accordingly, the defendant will not challenge his guilty plea, conviction, or sentence in any district court or appellate court proceedings.

    a. **EXCEPTIONS.** The defendant reserves the right to timely file a direct appeal challenging:

        (1) any sentence imposed in excess of the statutory maximum;

        (2) any sentence which constitutes an upward departure or variance from the advisory guideline range.

Rev. 8/14

The defendant also reserves the right to claim ineffective assistance of counsel in a direct appeal or § 2255 motion.

23. If the United States files a notice of appeal and such appeal is authorized by the Solicitor General, the defendant is released from the appellate waiver.

24. The defendant further reserves the right to timely move the district court for an amended sentence under 18 U.S.C. § 3582 in the event of a future retroactive amendment to the Sentencing Guidelines which would affect the sentence.

25. If the defendant receives a sentence within or below the advisory guideline range, this plea agreement shall serve as the defendant's express directive to defense counsel to timely file a "Notice of Non-Appeal" following sentencing, signed by the defendant.

## VIOLATION OF AGREEMENT

26. The defendant understands that if he breaches any provision of this Plea Agreement, the United States will be free from any obligations imposed by this agreement, but all provisions of the agreement remain enforceable against the defendant. In the exercise of its discretion, the United States will be free to prosecute the defendant on any charges of which it has knowledge. In such event, the defendant agrees not to assert any objections to prosecution that he might have under the Sixth Amendment and/or Speedy Trial Act.

27. In addition, if the defendant is released from detention prior to sentencing, he understands that the United States will no longer be bound by this agreement if he

violates any condition of his release prior to sentencing or prior to serving his sentence after it is imposed.

## ENTIRETY OF AGREEMENT

28. This document is the complete statement of the agreement between the defendant and the United States and may not be altered unless done so in writing and signed by all the parties.

Respectfully submitted,
KENYEN R. BROWN
UNITED STATES ATTORNEY

Date: October 2, 2015

Deborah A. Griffin
Assistant United States Attorney

Date: October 2, 2015

Christopher J. Bodnar
Assistant United States Attorney

Date: 10/2/15

Vicki M. Davis
Assistant United States Attorney
Chief, Criminal Division

I have consulted with my counsel and fully understand all my rights with respect to the offense charged in the Information pending against me. I have read this Plea Agreement and carefully reviewed every part of it with my attorney. I understand this agreement, and I voluntarily agree to it. I hereby stipulate that the Factual Resume, incorporated herein, is true

Rev 8/14

13

and accurate in every respect, and that had the matter proceeded to trial, the United States could have proved the same beyond a reasonable doubt.

Date: 10/6/15

_____
Christopher Manfuso
Defendant

I am the attorney for the defendant. I have fully explained his rights to him with respect to the offense(s) charged in the Information in this matter. I have carefully reviewed every part of this Plea Agreement with him. To my knowledge, his decision to enter into this agreement is an informed and voluntary one. I have carefully reviewed the Factual Resume, incorporated herein, with the defendant and to my knowledge, his decision to stipulate to the facts is an informed, intelligent and voluntary one.

Date: 10/2/15

_____
Michel Nicrosi
Attorney for Defendant

## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )   CRIMINAL NO. 15 - 223 - CG |
| | ) |
| CHRISTOPHER MANFUSO | ) |

### FACTUAL RESUME

The defendant, **CHRISTOPHER MANFUSO**, admits the allegations of Count One of the Information.

### ELEMENTS OF THE OFFENSE

**CHRISTOPHER MANFUSO** understands that in order to prove a violation of Title 18, United States Code, Section 371, as charged in Count One of the Information, the United States must prove:

*First*:    Two or more persons in some way agreed to try to accomplish a shared and unlawful plan to violate the Anti-Kickback Statute, the elements of which are:

(1) the defendant knowingly and willfully offered, paid, solicited, or received any remuneration, directly or indirectly, overtly or covertly, in cash or in kind;

(2) the remuneration was offered, paid solicited, or received, at least in part, to induce or in exchange for the purchasing, leasing, or ordering of any good, item, or service covered by a federal healthcare program; and

(3) the good, item, or service was paid for, in whole or in part, by a federal healthcare program.

*Second*:    The defendant knew the unlawful purpose of the plan and willfully joined in it;

*Third*:    During the course of the conspiracy, one of the conspirators knowingly engaged in at least one overt act as described in the Information; and

*Fourth*:    The overt act was committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

1

Rev. 8/14

## OFFENSE CONDUCT

Defendant, **CHRISTOPHER MANFUSO**, admits in open court and under oath that the following statement is true and correct and constitutes evidence in this case. This statement of facts is provided solely to assist the Court in determining whether a factual basis exists for **MANFUSO's** plea of guilty. The statement of facts does not contain each and every fact known to **MANFUSO** and to the United States concerning the defendant's involvement in the charges set forth in the plea agreement.

Industrial Pharmaceuticals Management ("IPM"), owned by a male individual known to **MANFUSO**, was a California-based company that specialized in establishing and managing in-house dispensaries in medical clinics treating workers compensation ("WC") patients. IPM supplied the dispensaries with drugs. IPM provided participating doctors with potential formularies and explained which drugs the doctors could dispense to WC patients and the resulting profit to be garnered from reimbursements. To induce and in exchange for the doctors' in-house dispensing business, there were times IPM paid certain participating doctors large sums of money in the form of a monthly "guarantee."

Dr. Xiulu Ruan and Dr. John Patrick Couch jointly owned and operated a pain management clinic under the name Physicians Pain Specialists of Alabama ("PPSA"). At PPSA, Dr. Ruan and Dr. Couch treated approximately 250 WC patients whose services and prescriptions were paid for by both state and federal WC insurance providers.

In March 2011, both Dr. Ruan and Dr. Couch entered into contracts with IPM, whereby IPM established and managed a WC's dispensary within the PPSA clinic. Thereafter, most of Dr. Ruan's and Dr. Couch's WC patients received their drugs dispensed directly out of the in-

house dispensary, rather than those patients receiving a prescription that could be filled at an outside pharmacy. After the drug was dispensed, IPM billed the patient's WC provider.

IPM employees MANFUSO and a female individual known to MANFUSO managed the account relationship with Dr. Ruan and Dr. Couch on behalf of IPM. MANFUSO and a female individual known to MANFUSO also oversaw the operation of the in-house dispensary service IPM provided the two doctors per the doctors' contracts with IPM.

One of MANFUSO's primary roles in managing IPM's account relationship with Dr. Ruan and Dr. Couch was to provide each doctor with options for their drug formularies. The doctors decided which drugs would be included in the formularies, but MANFUSO gave the doctors information on drugs to include the reimbursement amounts to be generated from billing the patient's WC provider. Moreover, Dr. Ruan regularly would complain to MANFUSO that IPM competitors (for the doctors' in-house dispensary business) could deliver higher profits on certain drugs and/or that IPM competitors gave Dr. Ruan information which MANFUSO had not provided about additional drugs to include higher reimbursement amounts. Dr. Ruan repeatedly threatened to take his in-house dispensary business to an IPM competitor if MANFUSO failed to give him such information or to pay him more money in the form of a higher monthly payment.

To induce and in exchange for their in-house dispensary business, IPM personally paid Dr. Ruan and Dr. Couch large sums of money on a monthly basis. The contract for Dr. Couch guaranteed him payments of at least $18,000.00 per month. The contract for Dr. Ruan guaranteed him payments of at least $45,000.00 per month, which later increased to at least $52,000.00 per month. These "guaranteed" payments functioned as kickbacks to secure the accounts for IPM.

Rev. 8/14

3

In or about December 2013, **MANFUSO** left the employment of IPM and formed a company called Comprehensive RX Management ("CRM"). CRM was in the same kind business as IPM. CRM purchased some of IPM's customer accounts including those accounts with Dr. Ruan and Dr. Couch. CRM entered into the same kind of arrangement with Dr. Ruan and Dr. Couch as had existed at IPM to include the guaranteed monthly payments for their in-house dispensary business.

Examples of e-mails between **MANFUSO** and Dr. Ruan include the following:

On March 11, 2011, right around the time Dr. Ruan and Dr. Couch signed their contacts with IPM, Dr. Ruan sent the following e-mail to **MANFUSO**: "*Hi, Chris, thanks! I will email you the list of drugs that I will use this weekend. Once we have stocked them, I will give the list of drugs to Dr. Couch and have him take a look at them. I will leave the price and potentials out in case he will pass along the list to his [physician's assistant].*"

On April 11, 2011, Dr. Ruan asked **MANFUSO**: "*Also, when do you look at how much we really make each month . . . .?*"

On April 15, 2011, a woman known to **MANFUSO** sent the following e-mail to Dr. Ruan: "*We had a great start to the new program launch this week with 120 medications dispensed on site in one day.*"

The following day, Dr. Ruan told a woman known to **MANFUSO**: "*We really need to get all the CII on stock so that we can avoid the mail order. As we are telling patients that the major advantages we switch is that we will let them take all meds when they leave. Also, I am hoping our margins are not affected due to the inability to stock them timely.*"

On July 26, 2011, Dr. Ruan sent an e-mail to MANFUSO telling him, *"Hi, Chris, can you please make sure that the check be sent to my home address, not Company. Also, please put it in an envelope saying confidential. I hate other open it. This one was opened by other and they saw it!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!"*

On September 26, 2011, Dr. Ruan asked MANFUSO: *"Hi, Chris, I called you earlier today re: our fee. So far, we have not received anything more than the guaranteed amount and it has been over 5 months since we started using your service. Why is there such a delay?? When are you going to do it based on our signed agreement? Both Dr. Couch and I need an answer!"*

On August 23, 2013, Dr. Ruan received the following e-mail from MANFUSO: *"I also wanted to let you know that you received your last guaranteed check (45k) last month. This month's check is for $41,769 and it should grow quite a bit as the collections build up under the new contract and as we add Cyclo 7.5 and Ultram ER 150 etc where you can. We are going to make really good money Dr. Ruan!"*

On November 12, 2013, MANFUSO told Dr. Ruan: *"You are dispensing 11.83 bottles per patient. Some insurance co's have said that's too many per patient and used that to pay less. We are fighting with the insurance co's to get payment for all charges. We have submitted reconsiderations and will eventually get paid. The main reason for the drop in the check is that the volume dispensed dropped. We will work to get paid on every single bottle dispensed to stat you are earning as much as possible."*

On April 14, 2014, Dr. Ruan sent the following e-mail to MANFUSO: *"You mentioned last week that you were concerned that Zofran got expensive. The price did go up a bit but it's still a very profitable medication to dispense!"*

Rev. 8/14

On May 5, 2014, **MANFUSO** informed Dr. Ruan, "*The cost for LidoPro is $20.99, the AWP is $465.85. This is a very profitable product. LenzaPatch. The cost is $34 and the AWP is $160.*"

On May 22, 2014, **MANFUSO** told Dr. Ruan that "*The LenzaPatch cost $34 and reimburse at $160. Most of our doctors are having their patients use this product at night and the LidoPro cream (Cost $21, Reimburse $465) during the day.*" The following day, CM noted, "*I misquoted the LenzaPatches . . . they are better than I initially indicated.*"

Between May 24, 2011 and January 21, 2015, IPM and later CRM personally paid $864,770.41 to Dr. Couch and $1,765,132.46 to Dr. Ruan. The $2,629,902.87 paid to Dr. Ruan and Dr. Couch was paid, at least in part, to induce and in exchange for the purchasing, leasing, or ordering of medical services and drugs dispensed to PPSA's WC patients whose insurance was covered, in whole or in part, by federal dollars.

**MANFUSO** admits that he knew about this unlawful plan and willfully joined in it.

AGREED TO AND SIGNED.

Respectfully submitted,

KENYEN R. BROWN
UNITED STATES ATTORNEY

Date: _____October 2, 2015_____

Deborah A. Griffin
Assistant United States Attorney

Date: _____October 2, 2015_____

Christopher J. Bodnar
Assistant United States Attorney

Date: 10/2/15                 

Vicki M. Davis
Assistant United States Attorney
Chief, Criminal Division

Date: 10/6/15                 

Christopher Manfuso
Defendant

Date: 10/2/15                 

Michel Nicrosi
Attorney for Defendant

Rev 8/14